# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

| | |
|---|---|
| **VIRGILE O. CARPENTER** | **CIVIL ACTION NO. 06-0906** |
| **-vs-** | **JUDGE DRELL** |
| **WAL-MART STORES, INC.** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

Before the Court is a motion for summary judgment (Doc. 28) filed on behalf of named defendant Wal-Mart Stores, Inc. by the correct defendant, Wal-Mart Louisiana, L.L.C. ("Wal-Mart"). For the reasons set forth below, the motion is granted. By separate judgment, all of the claims of the plaintiff, Virgile O. Carpenter ("Carpenter") will be dismissed with prejudice.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Id. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2510-11 (1986). If the movant produces evidence tending to show there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence

of a genuine issue of material fact for trial.  Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 321-23, 106 S. Ct. 2548, 2552 (1986)). In the analysis, all inferences are drawn in the light most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment.  Brock v. Chevron U.S.A., Inc., 976 F.2d 969, 970 (5th Cir. 1992).  Finally, "a mere scintilla [of evidence] is not enough to defeat a motion for summary judgment."  Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1086 (5th Cir. 1994) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

## II. BACKGROUND AND FACTS

This case may be summarized very simply: Carpenter alleges that Wal-Mart unlawfully discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  Carpenter alleges that her various medical problems, including lupus, fibromyalgia, and osteoarthritis, constitute disabilities; that Wal-Mart framed her for attempting to steal a digital camera and battery from the store on September 24, 2004; and that Wal-Mart then terminated her within a month after the incident because of her disability.  In defense, Wal-Mart argues that, although she had various ailments, Carpenter was not disabled; that she was not framed but actually did attempt to commit theft; and that she was fired for her attempted theft, rather than because of any disability, actual or perceived.

Carpenter filed an Equal Opportunity Employment Commission ("EEOC") Charge on June 14, 2005, alleging several types of discrimination.  The EEOC dismissed the

2

Charge on January 19, 2006, and on April 19, 2006, Carpenter filed suit in the Eighth

Judicial District Court for the Parish of Winn, Louisiana, specifically claiming that Wal-

Mart discriminated against her on the basis of disability.  (Doc. 6-2, p. 2, par. 11).  The

complaint is silent as to any other type of discrimination and any claim concerning

retaliation.  Wal-Mart properly removed the suit to this Court on May 26, 2006, asserting

both federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under

28 U.S.C. § 1332.  On September 6, 2007, Wal-Mart filed the instant motion for summary

judgment (Doc. 28), which concerns all of Carpenter's claims.

That is the simple overview.  The law applicable to this case, as set out in the next

section, is also relatively simple.   The difficulty lies in setting out the facts in

detail—whether actually undisputed or disputed but presumed to be in the plaintiff's

favor—and the task is made especially arduous by the plaintiff's strenuous objections

(Doc. 34-2) to Wal-Mart's statement of undisputed material facts (Doc. 28-2), which often

have no basis in record evidence.  The only path to the other side of this thicket of facts

is through the middle.  LR56.2 ("Opposition to Summary Judgment") provides:

> Each copy of the papers opposing a motion for summary judgment shall
> include a separate, short and concise statement of the material facts as to
> which there exists a genuine issue to be tried. All material facts set forth
> in the statement required to be served by the moving party will be deemed
> admitted, for purposes of the motion, unless controverted as required by
> this rule.

Id.  Below, we examine Wal-Mart's statement of purportedly uncontested material facts

in the order presented, noting for each one whether it is contested as required by LR56.2

and, if contested, determining whether and to what extent it is genuinely in dispute.

3

Each statement is set out as a block quote in bold below with our notes following in the

text.

> **1. Plaintiff was hired by Wal-Mart at its Winnfield, Louisiana store in 1995 and worked as a cashier, door greeter and sales associate during the course of her employment.**

(Doc. 28-2, p. 1).  This paragraph is not contested and is deemed admitted pursuant to

LR56.2.

> **2. The only significant problems that plaintiff experienced at work prior to her termination in 2004, was that she and some of the older cashiers began to receive less favorable schedules and fewer hours in approximately early 2003 and she was replaced in the Garden Center by a younger, Hispanic male in August 2004.**

(Doc. 28-2, p. 1).  Carpenter argues that this paragraph is a conclusion of law rather than

a statement of fact; however, because it lists only facts, we disagree.  Next, Carpenter

disputes this paragraph's characterization of her "only significant problems." (Doc. 34-2,

par. 3).  Although she does admit to the truth of the problems listed, she also asserts,

"As Plaintiff testified to in her deposition, she complained about Latasha Jones, her

Customer Service Manager [sic] failing to allow her the breaks that she needed."  (Doc.

34-2, par. 3).  Carpenter does not cite the relevant record evidence supporting this

assertion.   We find one reference in Carpenter's deposition linking Jones with

Carpenter's complaints about breaks:

> Q:  You didn't necessarily have a dispute with her in terms of not getting along with her, it was more she was taking this money and you felt you could be responsible for that because it wasn't under your control, correct?
>
> A:  Correct.
>
> Q: You didn't have any actual disputes with her or arguments or things of that nature?

> A: No, sir.  But she was the one that didn't give breaks from when I went open door policy about breaks, it was her.

(Carpenter Depo., p. 42).[1]  We assume that Carpenter did at least complain about breaks to Latasha Jones for some reason.

Carpenter continues, "Further Plaintiff testified that she needed these breaks as an accommodation for her disabilities so that she could perform the essential functions of her job."  (Doc. 34-2, par. 3).  Again, Carpenter cites to no record evidence to support this statement, and we can find none.  Carpenter's memorandum in opposition to Wal-Mart's motion for summary judgment contains similar assertions under a paragraph labeled "Regarded as Disabled," citing to various passages from Carpenter's deposition:

> [Carpenter] stated that she complained about her schedule and Defendant's refusal to allow her breaks.  [Carpenter deposition] 30-33. Continual requests for these breaks resulted in further punishment of late night shifts [sic] and further complaints by Plaintiff.  Id., 34-35. . . .  On three occasions she complained about her supervisor's refusal to allow her breaks, as well as about her supervisor/Customer Service Manager [sic] improperly collecting Plaintiff's "money bag."  Id. 35-37, 42. . . .

(Doc. 34, par. 19).

Based on the direct citations to the Carpenter deposition, we could expect those passages to at least link the complaints about breaks to some kind of medical condition.  Instead, pages 30-35 almost exclusively concern scheduling problems relating to Carpenter's and other employees' shifts ending late at night.  There is no reference to any disability—or, indeed, to any health concerns—and the only reference to breaks is the following passage:

---

[1]  Both Wal-Mart (Doc. 28-4) and Carpenter (Doc. 34-4) have attached excerpts from Carpenter's deposition.  Both versions overlap to some extent, and both have unique material.  For simplicity's sake, we will cite directly to the deposition rather than to a particular excerpt.

Q: Let's talk about the times you used the open door [policy] before Patricia Johnson was there.

A: Okay.

Q: Can you recall about how many times that occurred?

A: A few times we didn't get breaks at night and I did go discuss that with the manager.

Q: Okay.  Do you remember who the manager was?

A:  Mr. Mike – oh shoot.  It was Mr. Mike that was there.  He's at Ruston now.

Q: Was the problem taken care of?

A: At the time it was.

Q: All right.  This was you and some other people that had all complained?

A: Yes.

Q: Other night people?

A: Yes.

(Carpenter Depo, pp. 31-32).

Pages 35-37 of the deposition do not contain even a single reference to breaks.

Instead, Carpenter details her complaints to management concerning Latasha Jones:

Q: Do you remember if you ever used the open door [policy] about anything else other than schedules?

A: I did.  When Patricia Johnson was there I had a problem with Latasha Jones.

Q: Okay.  What was that?

A: She would not – we took our – it was customary to when it came time for you to get off, you had a money bag and you put your money out of your register and they did a key and that did a reading, show your activity in that register for the day.  There was a locked wooden box in a cart up there

6

by the podium.  We would take our own money out with our reading, put it in our bag and go drop it in that slot in that wooden box.  Well, for some reason Latasha started getting my money out and it would be like seven thousand dollars.  She, for the last two weeks I worked, when she was there, she was the C.S.M., that's the head over the cashiers, she would take my money out of that register, put my bag up under her arm and walk around with it.  And I asked her about it and she didn't answer me, she just looked at me.  I went to Shirley Varnell, who is . . . retired now, but she was the one over the cashiers when they were working.  I asked Shirley about it and she said, you'll have to go to somebody higher than me, because I've already reported it and can't get anything done about it.  Well, I was just concerned because that's a lot of money and it had my name on it and I was responsible for it.  It wasn't the policy for her to do that.  I don't know why she did it but I do know that she did it.

Q: Now, how many times did she do this?

A: She did it three times that I went to Shirley about, three specific times.

Q: Well, when Shirley said do you need to go to somebody higher, did you go to someone higher?

A: No, sir, because the next day is when the incident happened at the door [i.e., when Carpenter was detained for allegedly attempting to steal a digital camera and battery from the store].

Q: So this was the last two weeks that you worked there?

A: This was the last few days that I worked.

Q: The last few days that you worked there?

A: Right.

(Carpenter Depo, pp. 35-37).  Although Carpenter cites this passage (pages 35-37) as evidence that "[o]n three occasions she complained about her supervisor's refusal to allow her breaks, as well as about her supervisor/Customer Service Manager improperly collecting Plaintiff's 'money bag,'" (Doc. 34, p. 11), there is not a single reference to breaks in this entire passage, much less a reference to any medical condition.

7

Finally, pages 42-43 contain only a fleeting reference to breaks, again with no reference to a medical condition:

> Q: You didn't necessarily have a dispute with her [Latasha Jones] in terms of not getting along with her, it was more she was taking this money and you felt you could be responsible for that because it wasn't under your control, correct?
>
> A: Correct?
>
> Q: You didn't have any actual disputes with her or arguments or things of that nature?
>
> A: No, sir.  But she was the one that didn't give breaks from when I went open door policy about breaks, it was her.
>
> Q: Okay.  That was before Patricia Jones's day?
>
> A: Yes, sir.
>
> Q: That was years earlier?
>
> A: Within the last year.
>
> Q: Within the last year of your employment?
>
> A: Uh-huh.  (Yes)
>
> Q: Yes?
>
> A: But now, that wasn't me singled out, that was –
>
> Q: That was –
>
> A:  – as we've already discussed, that was –
>
> Q: Right.  That was you and the other people?
>
> A: Right.
>
> Q: Okay.  It was also you and the other people, just so we're clear about the scheduling, too, who were complaining about the scheduling and working later?

A: Yes, sir.

(Carpenter Depo, pp. 42-43)

Not once in any of the cited pages (Carpenter Depo, pp. 30-37, 42), or elsewhere in the record, does Carpenter state that her complaints about breaks were in any way related to her ailments.  To the contrary, Carpenter made the following admission:

Q: All right.  Up to the point that you were terminated, your medical problems never interfered with anything you did at work, is that right, any job that you were doing at work?

A: The one time when the osteoarthritis was in my knee, I was limited to – we had – they – cashiers have to walk out and stand in the middle of the aisle, I did not do that for about a week till I got proper treatment on my knee.  I stood in my – only one time was I ever limited to my walking ability.

Q: That was related to your osteoarthritis –

A: Correct.

Q.  – in your left knee?

A: Correct.

Q: You asked Wal-Mart for that limitation and that was given to you?

A: Yes, sir.  That was Christy Huckaby, my supervisor.

Q: All right.  Other than that though, you never asked for any other kind of accommodation for any of your problems?

A: No, sir.

Q: You didn't need it?

A: No, sir.

(Carpenter Depo, pp. 141-42).

9

To summarize, although we assume that Carpenter (along with other employees) did complain about breaks, there is no record evidence—not even a scintilla—that her reasons for doing so were based on her medical conditions.   Carpenter's conclusory allegations cannot create a fact that is not supported by the evidence.

> **3. In September 2004, plaintiff complained that a Customer Service Manager, Latasha Jones, was taking money bags from plaintiff's register. Plaintiff also believed that Ms. Jones was not giving plaintiff and other cashiers appropriate breaks.**

(Doc. 28-2, p. 2).  Carpenter asserts that she not only believed that Latasha Jones was not giving the employees appropriate breaks, she actually complained about the breaks; as already discussed, we assume that is true.   Carpenter further argues that she complained about breaks "because said breaks allowed her to manage her pain and perform the essential functions of her job.  Without the reasonable accommodation, she was unable to perform said tasks."  (Doc. 34-2, par. 4).  We have already extensively explained why this conclusory allegation is unsupported by any record evidence.

> **4. On Friday, September 24, 2004, approximately one day after plaintiff's third complaint about Latasha Jones, the door alarm sounded when plaintiff was attempting to leave the store after purchasing four large seat cushions.**

(Doc. 28-2, p. 2).  This paragraph is not contested and is deemed admitted pursuant to LR56.2.

> **5. At that time, Ms. Jones discovered a brown bag under the cushions in plaintiff's buggy and called the store manager, Patricia Johnson.**

(Doc. 28-2, p. 2).  This paragraph is not contested and is deemed admitted pursuant to LR56.2.

> **6. Ms. Johnson took the brown bag but refused to show plaintiff the contents because plaintiff did not have a receipt.**

10

(Doc. 28-2, p. 2). Plaintiff first disputes this paragraph "in that Plaintiff [is] unable to ascertain the motives of Ms. Johnson." (Doc. 34-2, par. 5).[2] Carpenter also asserts that "Plaintiff simply testified that she was not shown the contents of the bag. In fact, Plaintiff testified that she was not shown the contents of the bag until the end of her interrogation by Bill Bolton when he dumped the contents of the bag onto the desk for her to see." (Doc. 34-2, par. 5). Taking Carpenter's careful (if seemingly contradictory) objections into account, we can safely say that Ms. Johnson, at least, did not initially show Carpenter the contents of the bag.

> **7. On the following Monday, September 27 or Tuesday, September 28, plaintiff was called to a meeting with the District Loss Prevention Manager, Bill Bolton, and an Assistant Manager, Christy Huckaby.**

(Doc. 28-2, p. 2). Carpenter disputes the timing of the meeting, arguing that it occurred on Tuesday, September 28, 2004, rather than Monday, September 27, 2004. We note that this paragraph states that the meeting happened on one of those dates; that the Carpenter deposition demonstrates some confusion regarding the date[3]; and that the exact timing of the meeting is irrelevant. This is not a material fact, and judging by the wording of the paragraph, there is no genuine issue here, either. We assume, as Carpenter claims, that the meeting happened on Tuesday, September 28, 2004.

> **8. During that meeting, Mr. Bolton showed plaintiff the contents of the brown bag, a digital camera and a digital camera battery and plaintiff denied having any knowledge of those items.**

---

[2] We note that in her objection to paragraph 8, Carpenter admits that "[s]he asked to be shown the contents, but was told she had to produce a receipt." (Doc. 34-2, par. 7).

[3] Carpenter discusses a Monday meeting at length in her deposition (Carpenter Depo, pp. 73-77), but there is some later confusion about the date of the meeting (Carpenter Depo, pp. 83, 90).

(Doc. 28-2, p. 2).  Carpenter's objections here strain, and then break, credulity.  She argues as follows: "First, Plaintiff testified that she was never shown the contents of the bag. . . . Second, Bill Bolton did show her the contents of the bag at the end of the 3 hour interrogation. The bag contained a camera and a battery." (Doc. 34-2, par. 7).  Carpenter cannot say both that "she was <u>never</u> shown the contents of the bag" (emphasis added) and that she <u>was</u> shown the contents of the bag.  The record clearly shows that she was shown the contents, a digital camera and a battery.

Next, Carpenter plays semantic games by arguing that she was not shown the contents of the bag "during" the meeting but was instead shown them at the "end" of the meeting.  This is, at best, a distinction without a difference.  We fail to see any substantive difference in saying the revelation took place "during" the meeting versus at the "end" of the meeting, with all of the same people present and no temporal break in the proceedings.  Nevertheless, it is undisputed that Carpenter was shown the contents of the bag on the afternoon of the meeting, with the same people present and with no temporal gap between the meeting and the revelation.  That is the paragraph's most salient point.  Again, there is no genuine issue of material fact here.

**9. Plaintiff claims that she was suspended at that time by Mr. Bolton and advised that he would contact her after he had an opportunity to review store video footage.**

(Doc. 28-2, p. 2).  This paragraph is not contested and is deemed admitted pursuant to LR56.2.

**10. Plaintiff claims that she never heard back from Mr. Bolton and never attempted to contact Mr. Bolton again.**

(Doc. 28-2, p. 2).  This paragraph is not contested and is deemed admitted pursuant to

LR56.2.

> **11. Plaintiff did not return to work again after the September 2004, meeting with Mr. Bolton and Ms. Huckaby.**

(Doc. 28-2, p. 2).  This paragraph is not contested and is deemed admitted pursuant to

LR56.2.

> **12. Plaintiff claims that approximately one week after she was suspended, she requested a leave of absence to take advantage of eighteen months of insurance coverage and to let her body "rest" and "recuperate" from various medical conditions that plaintiff had throughout her Wal-Mart employment.**

(Doc. 28-2, p. 2).  Carpenter disputes this paragraph's characterization of her reasons for

returning to the store.  She asserts:

> Plaintiff testified that she returned because Dr. Iglesias removed her from work because she "was real sick" due to her disabilities: fibromyalgia, lupus, osteoarthritis and irritable bowel and bladder syndrome.  Although Plaintiff did testify as to 18 months in her deposition, Defendant is taking that information out of context.  Plaintiff in both her deposition taken on November 9, 2006 as well as in her EEOC Questionnaire, completed on April 13, 2005 stated that she was inquiring as to her insurance eligibility and availability.  So that her remaining wages could be used to pay any premiums due.

(Doc. 34-2, par. 8).  We note that, although it is undisputed that Carpenter did suffer from

the ailments she lists above, her characterization of those medical ailments as

"disabilities" is an assertion of law rather than of fact; indeed, the issue of whether

Carpenter had any "disabilities" is a decisive issue in this case.

      To address Carpenter's charge that Wal-Mart is taking the "eighteen months"

statement out of context, we quote the relevant passage:

> Q: Ms. Carpenter, your October 2004 calendar indicates – there's gave Pat vacation request, asked for medical leave with insurance and that is on

Tuesday, the 5th.  So according to your calendar, at least, that would have been one week after you had your meeting with Bill Bolton and Christy Huckaby. . . .  Now, had you ever taken a leave of absence before?

A: Yes, sir.

* * *

Q: All right.  When had you last taken a leave of absence?

A: It was the year before, I had had gallbladder surgery.

Q: All right.  How long were you on leave at that point?

A: Six weeks.

Q: Who treated you for the gallbladder surgery or who performed that surgery?

A: Doctor Payne was my surgeon.

Q:  Doctor Iglesias, had he filled out this leave paperwork for you?

A: Yes, sir.

* * *

Q: What was the reason for the leave?

A: Lupus and fibromyalgia.

Q: Doctor Iglesias wanted you to take how long off from work?

A: I was eligible for eighteen months and he told me to just apply for that.

Q: Now, why at that time?

A: Because I had been having a lot of problems with those ail – ailments and I had taken off several times.  I had had to take off four or five days.  And he told me I just needed to take off an extended period to let my bottom – body recoup – recuperate after having had that [gallbladder] surgery.  And he encouraged me to do it, it was on his advice that I was taking the medical leave.

14

Q: All right.  So after you had the gallbladder surgery he had been telling you, you needed to just take some time off and not work?

A: Not right away, because I just couldn't get up going again, you know, normal, and I was working sick, and, yes, he told me to – that he encouraged me to take a medical leave.  I had Blue Cross insurance.

Q: All right.  What I'm asking is why at that particular point, on October 5th, why then as opposed to, you know, at some other time, had your condition gotten worse or he just finally convinced you that it was – that you needed to take the time off?

A: Well, I just needed it.  Yes, I was not well at that time.

* * *

Q: He said you shouldn't be working for the next eighteen months?

A: He said I needed to take a rest, you know.

Q: Did he tell you how long he felt you needed to not be working?

A: No.  He – he didn't know when –

Q: But you said, I have eighteen months on insurance and he said, well, take that or request that?

A: Request that.  And, you know, when I got to feeling better if I wanted to, I could rescind it and go back to work.

(Carpenter Depo, pp. 92-96).  Taken in context and using Carpenter's own deposition testimony based on her own calendar entry, it is clear that paragraph 12 is not incorrect; it accurately characterizes Carpenter's testimony.  Carpenter may also have been "inquiring as to her insurance eligibility and availability," as she asserts—and we assume that she was doing that as well—but paragraph 12, as written, is at worst incomplete, not incorrect.

**13. None of plaintiff's medical conditions, including, fibromyalgia, lupus, osteoarthritis or irritable bowel or bladder syndrome, had ever prevented plaintiff from performing either her work duties or any other**

15

**activities, with the exception of an approximately one or two week period involving osteoarthritis in plaintiff's left knee.**

(Doc. 28-2, p. 3).  This paragraph is the most hotly contested one, as should be expected, given the centrality of these facts to Carpenter's claims.  Carpenter argues:

> Plaintiff repeatedly testified as to her disabilities and that they substantially limited her major life activity of working.  She stated in both her deposition as well as in her EEOC Questionnaire that she missed, and had excused by Defendant, absences for her disabilities [sic].  Furthermore, Plaintiff did state that she was able to perform her essential functions due to the absences that she took at her doctor's orders, as well as the scheduled breaks throughout the day.  When those breaks were taken away from her or denied to her by Management, she reported/complained about such treatment which ultimately led to her retaliatory discharge.

(Doc. 34-2, par. 9).

As we have already explained, there is no evidence linking Carpenter's complaints about breaks with her medical ailments[4], and her unsupported allegations now cannot suffice.  Also, we reiterate that her characterization of her ailments as "disabilities" is not a conclusion of fact but a conclusion of law, as is her claim that her ailments "substantially limited her major life activity of working."  We examine that issue below.  There is testimony and evidence, which we accept as true, that Carpenter was absent from work several times: a six-week excused absence in 2003 for gallbladder surgery; an excused absence of a few weeks for surgery on her left knee having to do with her osteoarthritis; and an unspecified number of short excused absences relating to various medical problems.  We further assume as true, for purposes of summary

---

[4] We also note that Carpenter makes no reference to breaks in her EEOC Questionnaire.  (Doc. 34-12).

16

judgment, Carpenter's testimony that she always gave Wal-Mart copies of her diagnoses and that Wal-Mart knew of all her medical ailments.[5]

In Part III of this ruling, we address Carpenter's claims that her ailments "substantially limited her major life activity of working" and that "she was able to perform her essential functions <u>due to</u> the absences that she took at her doctor's orders." (Doc. 34-2, par. 9) (emphasis added).  For now, we discuss only the record evidence. Other than the brief periods surrounding the excused absences for her gallbladder surgery and her left knee surgery, there is no evidence that she was limited in any way from performing <u>any</u> job function.  In fact, Carpenter repeatedly testified that she was <u>not</u> so limited:

Q: So you felt you were moved out there because of your age then?

A: Yeah, probably, because, you know, it's a lot of lifting out there.

Q: Did you ever complain that you couldn't do the lifting?

A: No, no, I did it.  I worked sick out there.  I had doctor's excuses, but I liked it and I was willing to do it.  At that time, I was having a lot of problems with my fibromyalgia and my lupus, but I always had doctor's excuses to cover it.

Q: What do you mean to cover it, when you were absent?

A: Yes, sir.  When I had to be out.

Q: But as far as lifting restrictions or anything like that, you didn't have any lifting restrictions?

A: Well, I did – I did my job.

---

[5]  Although there is a dispute concerning the documentation that Carpenter referred to in her deposition, for purposes of deciding this summary judgment, we draw all inferences in favor of the nonmovant, Carpenter.  Thus, we accept Carpenter's testimony as true for purposes of this ruling.

Q: Okay.  So you didn't go to Wal-Mart and say, I can't lift anything over –

A: No, sir.  I did not.

Q: All right.  You just did your job out there?

A: I did not complain.  I took – I did my job to the best of my ability and nobody else did my work.

Q: All right.  So if you had to lift something heavy out there, you just lifted it?

A: I lifted it or I – well, now, there's a Wal-Mart rule about that, so I would get another associate to help me lift what had to be lifted.

Q: Okay.  But there wasn't – you didn't have a problem doing your job?

A: No, sir.

Q: Okay.

A: I did not.  I did not neglect my duties, I fulfilled my duties.

(Carpenter Depo, pp. 51-53) (referring to her time working in the Wal-Mart garden center).

Q: All right.  So then you would have pain when you stand, walk, or lift a lot.  Now, was that pretty much a constant thing throughout your employment at Wal-Mart?

A: Yes.

Q: All right.  And it says you have osteoarthritis in your left knee, which causes fluid?

A: Correct.

Q: Okay.  What's the outward symptom of that, does that cause you problems walking, sitting, or just pain?

A: Walking and standing.

Q: Walking and standing?

18

A: Uh-huh.  (Yes)

Q: All right.  But you were always able to do your job with those problems?

A: Correct.

(Carpenter Depo, pp. 138-39).

Q: Right.  I understand that.  When you got hired at Wal-Mart three years later [in 1995], you came in and brought your [1992] diagnosis of fibromyalgia or lupus?

A: No.  If I wasn't working I didn't take it in.

Q: All right.  Well, that's what I'm asking you.  This was the diagnosis in 1992, so you wouldn't have brought your 1992 diagnosis into Wal-Mart, would you?

A: No, no, I wasn't working, wasn't connected to them.

Q: But in 2003, you would have brought that in, just brought it in even if you hadn't missed any work?

A: Yes.

Q: Just the diagnosis.

A: Yeah.

Q: Okay.  Who did you give that to?

A: I always gave that to the manager, whoever was the manager.

Q: Whoever was your manager, whoever was your supervisor, your hourly supervisor?

A: No.  I – I took that to the store manager.  I wanted to be sure that they were aware that I did have serious medical problems but it did not interfere with my job.

Q: All right.  Up to the point that you were terminated, your medical problems never interfered with anything you did at work, is that right, any job that you were doing at work?

A: The one time when the osteoarthritis was in my knee, I was limited to – we had – they – cashiers have to walk out and stand in the middle of the aisle, I did not do that for about a week till I got proper treatment on my knee.  I stood in my – only one time was I ever limited to my walking ability.

Q: That was related to your osteoarthritis –

A: Correct.

Q: – in your left knee?

A: Correct.

Q: You asked Wal-Mart for that limitation and it was given to you?

A: Yes, sir.  That was Christy Huckaby, my supervisor.

Q: All right.  Other than that, though, you never asked for any kind of accommodation for any of your problems?

A.  No, sir.

Q: You didn't need it?

A: No, sir.

(Carpenter Depo, pp. 140-42).

Q: All right.  And just so I'm clear, the osteoarthritis was limited to your left knee, correct?

A: Correct.

Q: It affected you standing for long periods and walking?

A: Correct.

Q: All right.  But you were still able to always do all your jobs at Wal-Mart?

A: Yes, and I got treatment for my knee, that only lasted, I believe, like two weeks.  That could have been some of these, I'm –

Q: That could have been medical excuses that you had?

20

A: It could have.

Q: Okay.  And then the fibromyalgia, same thing.  Pain walking, but you were always able to do your job?

A: I did my job.

Q: Perform your duties at Wal-Mart?

A: Correct.

Q: Is there anything you weren't able to do because of it?

A: No.

(Carpenter Depo, pp. 156-57).

Q: Is there anything that your fibromyalgia or arthritis or lupus prevent you from doing at the time you were working at Wal-Mart just before you left Wal-Mart.  Was there anything those conditions prevented you from doing, any kind of activity?

A: No, with the exception of the couple of weeks that I had the fluid in my knee.

Q: With the osteoarthritis?

A: With the osteoarthritis.  Nothing else every [sic] prevented my work.

Q: Okay.  Well, I'm talking about not just limited to work, just anything in your life that you just could not do because of your conditions?

A: No.

Q: Just that two week period with the flare up with your knee?

A: Yes.

(Carpenter Depo, pp. 162-63).

We discuss the legal significance of Carpenter's testimony below.  There is evidence (and, consequently, we appropriately assume) that Carpenter suffered from chronic pain relating to her medical conditions.  However, except for the few weeks

21

surrounding treatment of osteoarthritis in her left knee, Carpenter has pointed to no record evidence linking her ailments with any restrictions on working or other activities. To the contrary, Carpenter testified repeatedly and without qualifications that she was able to do all of her job functions and life functions; that, although she told Wal-Mart about her medical conditions, she did not inform Wal-Mart that she was under any restrictions from work activity, even when her work in the garden center required lifting; and that she always did her job.  Carpenter has failed to raise a genuine issue of material fact regarding paragraph 13; it accurately reflects the record, and we accept it.

> **14. When plaintiff did not hear back from management about her alleged leave request, she contacted an assistant manager on October 21, 2004, and was purportedly advised that Mr. Bolton had instructed that manager to terminate plaintiff's employment.**

(Doc. 28-2, p. 3).  Carpenter disputes Wal-Mart's characterization of her reason for calling (she claims that she called "because her vacation pay had not yet arrived"), but she does not dispute that she was advised that she had been terminated during the call.  To the extent there is any dispute over this fact, we draw all inferences in the light most favorable to the nonmovant, Carpenter.  Thus, we accept Carpenter's explanation of her reason for calling as true.

> **15. Plaintiff's personal calendar for 2004, indicates that plaintiff was terminated from her employment on our about September 28, 2004.**

(Doc. 28-2, p. 3).  Carpenter states that she "testified that on October 21, 2004, she wrote on her calendar in the square entitled September 28, 2004 what she was told by Cheryl Demery, i.e., 'terminated.'" (Doc. 34-2, par. 11).  We accept Carpenter's statement as true, but it does not contradict paragraph 15 nor create a genuine issue of material fact.

22

**16. On June 14, 2005, plaintiff filed an EEOC Charge alleging race, age, sex and disability discrimination.**

(Doc. 28-2, p. 3).  Carpenter disputes this paragraph "to the extent Defendant does not list 'retaliation' for Defendant's illegal actions against Plaintiff."  (Doc. 34-2, par. 12).  Carpenter bases her objection on her claims that the EEOC Charge (Doc. 28-5) was filled out by an EEOC representative; that her retaliation claim "is clear" from her EEOC Questionnaire (Doc. 34-12); and that Wal-Mart mentions in paragraph 18 that Carpenter "believes that her termination . . . may also have been the result of her complaints about Latasha Jones."  Carpenter cannot rely on paragraph 18 to preserve a cause of action.  Paragraph 18 mentions Carpenter's subjective belief about the cause of her termination; it does not say that Carpenter has actually stated a claim for retaliation.  Indeed, the paragraph also mentions age, race, and gender discrimination, and those claims are not before us in this case.  If Carpenter <u>has</u> preserved and stated a claim for retaliation, it must come from some source other than paragraph 18 of Wal-Mart's statement of uncontested material facts.

Carpenter's EEOC Charge, which Carpenter claims was filled out by an EEOC representative, has a section headed "DISCRIMINATION BASED ON" with the following boxes available to be checked: race, color, sex, religion, national origin, retaliation, age, disability, and other.  (Doc. 28-5).  Of these boxes, race, sex, age, and disability are all checked; retaliation is not.  The form's largest section, headed "THE PARTICULARS ARE," contains the following typed account:

> I was hired in 1995 as a people greeter.  I was moved froom [sic] the garden center and back to cashier and given night hours in August 2004.  I was discharged on October 21, 2004.

> I was told that the job in garden center was going to end but a Mexican male was placed in the job.  I was suspended on September 24, 2004 and accused of attempted theft.  When on suspension I applied for medical leave on October 5, 2004 and was refused.  No reason was given for my termination.
>
> I believe that I was discriminated against in violation of the Age Discrimination in Employment Act because of my age, 60 years old; the Americans with Disabilities Act because of my disability and Title VII of the Civil Rights Act of 1964 because of my race (white) and sex.

(Id.)  At the bottom of the form, above the line for "Charging Party Signature," appears the following notice: "I declare under penalty of perjury that the above is true and correct."  (Id.)  The form is signed Veo Carpenter (admittedly the plaintiff's signature) and dated June 14, 2005.

As for the EEOC Questionnaire, there is some dispute as to whether Wal-Mart ever saw that document.  The first page of the EEOC Charge Questionnaire is clearly marked "EEOC Use Only."  (Doc. 34-12, p. 3).  Nevertheless, we quote the potentially relevant passages from the Questionnaire, specifically those where Carpenter discussed the action taken against her (form language in bold):

> **What action was taken against you that you believe to be discriminatory?  What harm, if any, was caused to you or others in your work situation as a result of that action?  (if more space is required, use reverse.)**
>
> I was third in seniority of cashiers, the other two was given day shifts and off weekends.  I was usually given the night shifts (like – 4-11 or 4-12) Some time ago I was given the 7-4 or 8-5 week-day shifts.  The new cashiers were younger and worked the day shifts.  I have serious medical problems and several times during 2004 I was absent from work 1 or 2 weeks on advice of my Doctor.  I had short and long term disability insurance.  On Sept 28, 2004 I applied for 59 hours of vacation time to be divided for 3 weeks I did not [receive] this money until Nov. 4, 2004.  The time cards had not been sent in.

24

On October 5, 2004 I was real sick and went to Dr. Iglesias.  I have lupus-fibromyalgia.  The Doctor filled out medical leave papers for a year.  I contacted the insurance company to confirm my eligibility.  I could use it for 18 months they told me.  I gave the papers to Mg. [sic] Patricia Johnson, she said she would file them but she ignored them.  The Personal Mg. S. Box [sic] advised me that it was up the Mag. [sic] if I could use the insurance.  This was paid for by me – not Wal-Mart.  By terminating me without reason, she took away all my benefits and caused me much embarrassment from the laughing and questioning of some co-workers.

* * *

**Why do you believe action was taken against you?**

I cannot explain why I was treated so bad.  I was an honorable and trusted employee for almost ten years.

(Doc. 34-12, pp. 3-4).

**What specific action(s) did your employer take against you?**

Scheduled me all late night hours.  Some weeks she did not give me 28 hours that was supposed to be the minimum.  Would not let me use the disability insurance I was paying for.  Was rude talking when I tried to talk to her.

(Doc. 34-12, p. 5).  We only list the facts at this point; we address their significance in

Part III.

**17. Plaintiff's Charge was dismissed by the EEOC on January 19, 2006.**

(Doc. 28-2, p. 3).  This paragraph is not contested and is deemed admitted pursuant to

LR56.2.

**18. Plaintiff believes that her termination was the result of age, race and gender discrimination and may also have been the result of her complaints about Latasha Jones.**

(Doc. 28-2, p. 3).  This paragraph is not contested and is deemed admitted pursuant to

LR56.2.

25

**19. Plaintiff was not substantially limited from performing any activity, including working, up to the time of her termination.**

(Doc. 28-2, p. 3).  Carpenter objects as follows:

> Plaintiff adamantly objections to ¶ 19.  Plaintiff testified repeatedly about her disabilities and the pain and suffering they caused (and cause) her to endure.   She testified that usually she could manage her work responsibilities without complaint, but that was when the breaks and scheduling allowed her rest.   When her Customer Service Manager, Latasha Jones refused to allow such breaks, she reported/complained to Management.  Therefore, Defendant's statement in ¶ 19 is blatantly false.

(Doc. 34-2, par. 13).

Once again, we note that Carpenter did testify repeatedly about her ailments and about the pain and suffering they caused (and cause) her to endure.  However, we reiterate that Carpenter's conclusory allegations (i.e., that she was able to work without complaint only "when the breaks and scheduling allowed her rest" and that her complaints about the lack of breaks were related to her ailments) are not supported with record evidence.  As we have explained in detail in connection with paragraph 13, Carpenter testified without qualification that she was always able to do all of her job functions, albeit with pain, except for the period of a few weeks where she suffered from and was treated for osteoarthritis in her left knee,[6] and that she was not otherwise prevented from doing anything in her life outside of her job.

Paragraph 19 is not blatantly false, as Carpenter claims.  Whether it is legally correct, however, is an issue that we deal with in Part III of this ruling.  As written, paragraph 19 is more a conclusion of law than a mere statement of fact.  Whether Carpenter "was not substantially limited from performing any activity" (as Wal-Mart

---

[6] She was also out for gallbladder surgery for a period of approximately six weeks, but that surgery evidently was not related to any chronic ailment.

puts it) or suffered from "disabilities" rather than just medical conditions (as Carpenter

puts it) is, as we soon discuss, a threshold issue in this case.

> **20. Although plaintiff's various medical conditions made it difficult for plaintiff to walk, stand for long periods or lift heavy objects, she managed to [sic] all those things without ever complaining to management or seeking any type of accommodation at any time during her employment with Wal-Mart.**

(Doc. 28-2, p. 3).  Carpenter objects as follows:

> Plaintiff disputes ¶ 20.  Plaintiff admits that she endured the medical disabilities set forth in this paragraph, but affirmatively states that she did complain to Management about such disabilities and continually kept Defendant apprised of her worsening condition.

(Doc. 34-2, par. 14). We have repeatedly observed that Carpenter's conclusory use of the

word "disabilities" rather than "conditions" or "ailments" draws a conclusion of law.

We have also already assumed in Carpenter's favor that she kept Wal-Mart apprised of

her medical diagnoses and various medical conditions.  However, we also note that the

fact that Carpenter apprised Wal-Mart of her conditions does not mean that she

complained to Wal-Mart or sought accommodation.  Indeed, when Carpenter testified

as her deposition about giving her diagnoses to her manager, she said, "No.  I – I took

that to the store manager.  I wanted to be sure that they were aware that I did have

serious medical problems <u>but it did not interfere with my job</u>." (Carpenter Depo, p. 141)

(emphasis added).

The discussion of Paragraph 20 does need to be modified in one respect.

Although not specifically mentioned by Carpenter in her objection, for "the couple of

weeks that [she] had the fluid in [her left] knee" with osteoarthritis (Carpenter Depo, p.

162), Carpenter did have difficulty performing her job duties; complained to

management; and received an accommodation.  As she testified in her deposition, that was the only such period caused by her lupus, fibromyalgia, or osteoarthritis.  (<u>Id.</u>).  Consequently, paragraph 20's assertion that she managed to do all those things "without <u>ever</u> complaining to management or seeking any type of accommodation <u>at any time</u> during her employment with Wal-Mart" (emphasis added) is clearly factually inaccurate, at least insofar as that single period of a couple of weeks is concerned.

## III.  ANALYSIS

Having now established all of the potentially relevant facts, we may finally apply the law to those facts.  Carpenter's complaint rests on her claim of disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u>  Accordingly, the disability discrimination claim is the primary focus of this ruling.  In addition, because Carpenter now argues that the complaint states a retaliation claim in addition to the disability discrimination claim, we also address whether Carpenter has presented and preserved any claim based on retaliation.

<u>III(A).  DISABILITY DISCRIMINATION CLAIM</u>

The Fifth Circuit has explained the standard for disability discrimination in violation of the ADA as follows:

> This being a case brought under the Americans With Disabilities Act where only circumstantial evidence is offered to show the alleged unlawful discrimination, we apply the <u>McDonnell Douglas</u>, Title VII burden-shifting analysis.  <u>See</u> <u>Daigle v. Liberty Life Ins. Co.</u>, 70 F.3d 394, 396 (5th Cir.1995) (<u>citing</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).  Under this framework, a plaintiff must first make a <u>prima facie</u> showing of discrimination by establishing that: (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees.  <u>See</u> <u>Burch v. Coca-Cola Co.</u>, 119 F.3d 305, 320

(5th Cir.1997), cert. denied 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).  Once the plaintiff makes his prima facie showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination.  See Daigle, 70 F.3d at 396.

As noted above, the threshold element of a prima facie showing of discrimination under the ADA is a showing that the plaintiff either is, or is regarded as being disabled.  Failure to establish an actual or perceived disability is thus fatal to a plaintiff's case.

* * *

A "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of such impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102.  A "major life activity," as defined by the EEOC regulations includes such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2.  And one is "substantially limited" in a major life activity if he is:

> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or

> (ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2.  Furthermore, an individual may be "regarded as disabled" if he has a physical or mental impairment that does not substantially limit major life activities but nonetheless is treated by a covered entity as constituting such a limitation.  See id.

. . . [T]he analysis of whether a plaintiff's claimed impairment interferes with a major life activity in such a substantial way as to constitute a disability requires an individualized inquiry.  See Sutton v. United Air Lines, Inc, 527 U.S. 471, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999).

* * *

> In order to be "regarded as" disabled a plaintiff must: (1) have a physical
> or mental impairment that does not substantially limit major life activities,
> but be treated as such by an employer; (2) have a physical or mental
> impairment that substantially limits one or more major life activities, but
> only because of the attitudes of others toward the impairment; or (3) have
> no actual impairment at all, but be treated by an employer as having a
> substantially limiting impairment. See [Sherrod v. American Airlines, Inc.,
> 132 F.3d 1112, 1121 (5th Cir.1998)].  The plaintiff also must establish that
> the impairment, if it existed as perceived, would be substantially limiting.
> See [Deas v. River West, L.P., 152 F.3d 471, 476 (5th Cir.1998), cert. denied,
> 527 U.S. 1035, 119 S.Ct. 2392, 144 L.Ed.2d 792 (1999)].

McInnis v. Alamo Community College Dist., 207 F.3d 276, 279-81 (5th Cir. 2000).

It is undisputed that Carpenter has several ailments, including lupus, fibromyalgia, and osteoarthritis.  Moreover, these medical conditions clearly are impairments, in that they cause her to suffer pain.  To qualify as a "disability" under the ADA, however, the impairment must be substantial.  Although Carpenter asserts that her ailments "substantially limited her major life activity of working" (Doc. 34-2, par. 9), she has presented no evidence to support that assertion.  At best, she can point to her chronic pain and to her excused absences of approximately six weeks for gallbladder surgery; approximately two weeks for treatment of osteoarthritis in her left knee; and, sporadically, up to a few days at a time for various medical reasons.

Carpenter's claim that she was "substantially limited" in any major life activity is refuted by her own repeated testimony (extensively quoted above, especially in connection with paragraph 13 of Wal-Mart's statement of uncontested material facts) that she was able to perform all of her job functions without any limitations or accommodations whatsoever, both before and after her gallbladder surgery and left knee treatment.  (Carpenter Depo, pp. 51-53, 138-39, 140-42, 156-57, and 162-63).  When

directly questioned about whether her conditions prevented her from doing any activities, "not just limited to work, just anything in your life that you could not do because of your conditions," Carpenter replied, "No." (Carpenter Depo, pp. 162-63). The record is absolutely clear that, although Carpenter's ailments made it painful to walk and stand and were thus impairments, they did not <u>substantially</u> limit any major life activity during her employment with Wal-Mart, especially not the major life activity of working. Plaintiff's arguments to the contrary are mere conclusory allegations unsupported by the record. This is not, of course, to say that Carpenter's ailments could not constitute a disability, under the appropriate facts, in light of the necessarily individualized and fact-specific inquiry required. Yet, it is clear that <u>these</u> facts do not permit the conclusion that Carpenter ever suffered from a disability within the meaning of the ADA.

To be perfectly clear, we rule that Carpenter neither had "[a] physical or mental impairment that substantially limits one or more of the major life activities," 29 C.F.R. § 1630.2(g)(1), nor had "[a] record of such an impairment," 29 C.F.R. § 1630.2(g)(2). Even though Carpenter did not have a disability under those provisions, she may state a claim for disability discrimination under 29 C.F.R. § 1630.2(g)(3) if she is "regarded as having such an impairment" (i.e., one "that substantially limits one or more of the major life activities," as phrased by 29 C.F.R. § 1630.2(g)(1)). To prove that she was "regarded as having such an impairment," Carpenter must:

> (1) have a physical or mental impairment that does not substantially limit major life activities, but be treated as such by an employer; (2) have a physical or mental impairment that substantially limits one or more major life activities, but only because of the attitudes of others toward the impairment; or (3) have no actual impairment at all, but be treated by an employer as having a substantially limiting impairment. [She] also must

31

establish that the impairment, if it existed as perceived, would be substantially limiting.

McInnis, 207 F.3d at 281.

As noted above, we assume that Carpenter actually had an impairment caused by her medical conditions and that she informed Wal-Mart of those medical conditions. However, there is no evidence anywhere in the record that Wal-Mart ever treated her as being substantially impaired.  Furthermore, not only did Carpenter  repeatedly testify that she was not limited from doing any job activity and never asked for any accommodation (other than the week leading up to her knee treatment), she specifically testified that when she took documentation of her medical conditions to her manager, "I wanted to be sure that they were aware that I did have serious medical problems but it did not interfere with my job."  (Carpenter Depo, p. 141) (emphasis added).

The facts of this case are unlike those in McInnis, where the Fifth Circuit permitted a discrimination case to proceed under the "regarded as" theory based on the testimony of the employer's "ADA compliance coordinator that she could tell from [the plaintiff's] file that he was either disabled or perceived as disabled by [the employer]." McInnis, 207 F.3d at 281.  This case is more like Aldrup v. Caldera, 274 F.3d 282 (5th Cir. 2001), where the Fifth Circuit declined to allow the plaintiff to proceed under the "regarded as" theory, because the plaintiff "presented no evidence whatsoever to base the slightest inference that defendant believed he was disabled."  Id. at 287.  In this case, there is simply nothing in the record to support Carpenter's claim that Wal-Mart regarded her as having any substantial limitation on any major life activity.

32

A medical condition is not necessarily an impairment, and an impairment is not necessarily a substantial limitation on a major life activity so as to be a disability within the meaning of the ADA.  Here, the record supports Carpenter's assertions that she suffered from medical conditions and that those conditions were impairing, but the record contains no evidence in support of her conclusory allegations that she was either <u>substantially</u> limited in any major life activity or that she was regarded as having such a substantial limitation.  Consequently, we grant Wal-Mart's motion for summary judgment as to Carpenter's disability discrimination claim under the ADA, 42 U.S.C. § 12112.

### III(B).  RETALIATION CLAIM

At first blush, Carpenter's failure to present any competent summary judgment evidence of a disability would seem to require dismissal of her suit.[7]  However, the complaint states, in its facts section, that "Wal-Mart was fully aware of Plaintiff's disability and retaliated against her in order to force her into early retirement and/or otherwise discharge her."  (Doc. 6-2, p. 2).  Carpenter now argues she has asserted a retaliation claim based on that sentence of the complaint, and that the retaliation claim is properly before this Court.

There are serious problems with Carpenter's arguments.  Most significantly, the June 14, 2005 EEOC Charge, as discussed above, has several items checked (race, sex,

---

[7]  The complaint apparently asserts only an ADA disability discrimination claim, although it makes fleeting and insubstantial references to state law in the sections on remedies, specifically exemplary damages (Carpenter's "state-protected rights") and the specific relief of a prohibitory injunction ("unlawful employment practices as defined in the Louisiana Labor Code").  (Doc. 6-2, p. 4).  Carpenter's intention to limit her complaint to the federal claims discussed in this ruling is made clear by her silence regarding any other claims, even though the motion before us seeks dismissal of the entire lawsuit.  (Doc. 28-3, pp. 1, 17).

age, and disability) under the heading "DISCRIMINATION BASED ON," but although retaliation is printed as a possible choice, it is not checked.  (Doc. 28-5).  Under the heading "THE PARTICULARS ARE," there is a typed account of Carpenter's claims, with mention of several types of discrimination but no reference to retaliation (Id.). Significantly, although Carpenter states (and we accept as true) that an EEOC representative actually filled out the form, Carpenter signed the EEOC Charge under the statement "I declare under penalty of perjury that the above is true and correct."  (Id.). Although Carpenter now argues that her retaliation claim is clear from her answers to the EEOC Questionnaire, we can find no reference to a retaliation claim in those answers, which are excerpted in Part II of this ruling in connection with paragraph 16 of Wal-Mart's statement of uncontested material facts.

Nationally, several courts have addressed similar situations, and they employ similar analyses.  Although unpublished and thus not precedential, we adopt the Fifth Circuit's analysis in Miller v. Southwestern Bell Telephone Co., 51 Fed.Appx. 928, 2002 WL 31415083, *6-*8 (5th Cir. 2002) (unpublished table opinion), which, for the convenience of the parties, we excerpt as follows:

> Miller also asserts that he suffered unlawful retaliation for participating in an act protected by the ADA. On this claim, we find it important to delve into issues that are more procedural in nature than those discussed by the district court.  SWBT has asserted both at the trial level and on appeal that Miller failed to exhaust his administrative remedies as to his claim for retaliation.  Throughout the course of this litigation, Miller, for reasons unknown to this court, has completely disregarded this line of argument. Miller's failure to articulate some modicum of rebuttal argument on this point proves injurious to his cause, as the failure to exhaust administrative remedies serves as an independent basis to affirm summary judgment. See Randel v. United States Dep't of Navy, 157 F.3d 392, 395 (5th Cir.1998) (stating that a plaintiff asserting racial discrimination must exhaust his

34

administrative remedies on the claim before seeking review in federal court).

The trial court did not rule on this issue, instead opting to evaluate the substantive requirements of Miller's retaliation claims, concluding eventually that he failed to raise a genuine issue of material fact on one element of his prima facie case.  Since we conclude that the district court lacked jurisdiction to consider Miller's retaliation claim on the merits, we need not address the merits.

The jurisdictional problem here relates to the fact that in the charge Miller filed with the EEOC, he did not check the box corresponding with "retaliation," but did so for "age" and "disability."  From a procedural standpoint, SWBT argues, Miller only properly raised allegations of intentional discrimination under the ADA and the ADEA.  Citing a number of cases, SWBT asserts that because the alleged retaliation in the instant case occurred before Miller filed the initial EEOC charge, Miller should have exhausted his administrative remedies on that claim prior to filing.

Given this argument, directly at issue is whether Miller's failure to fill in the appropriate box for retaliation, when he already marked the box for disability and age discrimination, compels the conclusion that he failed to exhaust his administrative remedies before filing a lawsuit under the ADA.  A review of this case using the same standards as the lower court produces the same exact outcome, but on a dissimilar basis: Summary judgment is appropriate because Miller failed to exhaust his administrative remedies on his claim for retaliation.

There are several reasons why we believe this the correct outcome in this matter.  First, the federal anti-discrimination statutes, most notably, Title VII have consistently required claimants to fill in the appropriate corresponding boxes when filing their claim for unlawful employment action.  See, e.g., Price v. Harrah's Md. Heights Operating Co., 117 F.Supp.2d 919, 921-22 (E.D.Mo.2000) (granting summary judgment on failure to exhaust administrative remedies grounds for employer because plaintiff did not check the box for retaliation and did not specifically allege retaliation in the text of the charge); McCray v. DPC Indus., Inc., 942 F.Supp. 288, 294 (E.D.Tex.1996) (informing that when asserting a claim for discrimination under Title VII, it is necessary for the appropriate box be checked in the EEOC claim).[FN5] By simply checking the box corresponding to the alleged basis for unlawful employment action, a plaintiff sufficiently exhausts his administrative remedies prior to a Title VII lawsuit.  See, e.g., id.

[FN5]. It is well-established that summary judgment may be granted against a non-movant solely on the basis of failure to exhaust administrative remedies. <u>E.g.</u>, <u>Inst. for Tech. Dev. v. Brown</u>, 63 F.3d 445, 447 (5th Cir.1995). The Supreme Court has held that a plaintiff may not bring claims in a lawsuit that were not included in the filed EEOC charge. <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). This requirement serves to enhance the administrative enforcement process by ensuring that the EEOC can conduct a full investigation while also providing the employer with advanced notice of the claim and an opportunity to resolve the dispute. <u>See</u> <u>Harper v. Godfrey Co.</u>, 45 F.3d 143, 148 (7th Cir.1995).

Second, the same procedural requirements for Title VII have been interpreted to apply to EEOC charges filed under the ADA as well. This court has also held that the ADA incorporates by reference the administrative procedural requisites found in Title VII, <u>Dao v. Auchan Hypermarket</u>, 96 F.3d 787, 789 (5th Cir.1996), and that adherence to these prerequisites is necessary prior to commencing an ADA action in federal court against an employer, <u>id.</u> Although this court has not addressed the issue of whether an ADA case cab be dismissed for failure to fill in the appropriate box, other courts encountering this issue support the granting of summary judgment. <u>See, e.g.</u>, <u>Talbot v. U.S. Foodservice, Inc.</u>, 191 F.Supp.2d 637, 640 (D.Md.2002) ("Where a litigant has neither checked the box for discrimination, nor mentioned disability discrimination or the ADA anywhere in his charge of discrimination, the EEOC cannot reasonably have been expected to have investigated disability discrimination."); cases cited infra. Hence, the "box filling" requirement cited by SWBT appears to arise in the ADA context as well as the Title VII context.

Third, one of our sister circuits has indicated that in the ADA context, a plaintiff's failure to fill in the appropriate box in the filed charge, coupled with the inability to describe the general nature of the claim in the narrative section of the charge, forms a sufficient basis for summary judgment. The Seventh Circuit decided that when a plaintiff fails to mark the appropriate box for "retaliation" but continues to seek relief for disability discrimination and retaliation, the plaintiff has nevertheless failed to exhaust his administrative remedies as to the retaliation claim. <u>Cable v. Ivy Tech State College</u>, 200 F.3d 467, 477 (7th Cir.1999).[FN6] The <u>Cable</u> court observed that the body of the plaintiff's EEOC charge did not even "hint at retaliation, much less develop [a] factual basis for the claim." <u>Id.</u> Even when viewed in the light most favorable to the plaintiff, the statement of discrimination did not implicate the behavior that plaintiff asserted to be the basis of his retaliation claim. <u>Id.</u> The Seventh Circuit

deemed the plaintiff's narrative to have given insufficient indication to the EEOC or the employer that he was also seeking redress for unlawful retaliation.  Id.

FN6. In his EEOC charge, Cable checked the "Other" box only, but did not write in the narrative portion of the claim that he was discriminated against on the basis of his disability.

In affirming summary judgment on plaintiff's retaliation claim, the Cable court found that there was no indication from the EEOC charge boxes, narrative, or supplemental material that the plaintiff sought redress for the retaliation claim, or even, for the matter, that the alleged retaliation "was like or reasonably related to" his statutory rights stemming from the ADA. Id.; see also Thompson v. KN Energy, Inc., 177 F.Supp.2d 1238, 1254-55 (D.Kan.2001) (granting summary judgment against plaintiff for failing to exhaust administrative remedies under the ADA when marked boxes for "sex" and "disability" but not "retaliation").  The similarity between Cable and the instant case is marked, particularly with the absence of narrative or other supplemental EEOC materials indicating that Miller was seeking redress for unlawful retaliation.   The information, or lack thereof,FN7 included on Miller's filed EEOC charge creates a strong presumption in favor of a finding of failure to exhaust administrative remedies.

FN7. The entirety of Miller's narrative reads as follows: I. On or about November 10, 1998, I was discharged from the position of Customer Services Technician.  Respondent is public telephone system. II. On or about November 10, 1998, Ernie Carey, Division Manager, Installation and Repair, informed me that I was discharged for allegedly falsifying a time report and a form called 6218, trouble ticket.  III.  I believe that I was discriminated against because of my age, 48, in violation of the Age Discrimination in Employment Act of 1967. Worth noting is that there was no continuation sheet for this narrative filed, nor a supplemental document of any kind in the trial record.

* * *

Despite the trial court's disregard of this issue, SWBT persisted in its failure to exhaust administrative remedies argument.  This court concludes that because Miller did not check the check the correct box on the EEOC complaint form or otherwise disclose his retaliation claim and thereby exhaust its administrative remedies, he is procedurally precluded from asserting a retaliation claim under the ADA.

Miller, 2002 WL 31415083 at *6-*8.

Again, Miller is unpublished and thus not binding authority, but we agree with every part of its analysis and could hardly present the law better than it does, so we adopt it. Whether Carpenter personally filled out the form or whether it was filled out by an EEOC representative, Carpenter signed her name to the completed document under penalty of perjury. Knowledge of that document's contents is necessarily imputed to her. A retaliation claim is certainly not present on the face of the EEOC charge, and it is not clear from the EEOC Questionnaire. We join the line of cases cited in Miller in ruling that Carpenter has failed to exhaust her administrative remedies based on her failure to check (or to have checked, if filled out by someone else) the box for retaliation on the EEOC Charge; to include any reference to a retaliation claim on the EEOC Charge; and to clearly indicate a retaliation claim in any of her other EEOC documentation. Accordingly, Wal-Mart is entitled to summary judgment on the retaliation claim.

We also note that, even if Carpenter had not failed to exhaust her administrative remedies, it is not clear from the face of the complaint that Carpenter stated a claim for retaliation. Although the word "retaliated" does appear on the face of the complaint, the context was Carpenter's allegation that "Wal-Mart was fully aware of [her] disability and retaliated against her," which sounds more like a disability discrimination claim than a retaliation claim based on Carpenter's having engaged in some kind of protected activity. Carpenter's counsel apparently felt the same way (at least prior to opposing this motion), for in Carpenter's deposition the following exchange took place:

> [Wal-Mart counsel]: Okay. You're not making a claim for retaliation, are you?

[Carpenter counsel]: I don't think so.

[Wal-Mart counsel]: I don't think so.  I see it in my note here, but I don't see it in her petition.

[Carpenter counsel]: I think she's just making an A.D.A. claim.

[Wal-Mart counsel]: A.D.A. claim, yeah.

[Carpenter counsel]: No race or age –

[Wal-Mart counsel]: Right.

(Carpenter Depo, pp. 166-67).

Consequently, even if Carpenter had not failed to exhaust her administrative remedies, we are not convinced she even stated a retaliation claim in her complaint. Nevertheless, she <u>has</u> failed to exhaust her administrative remedies, and Wal-Mart is entitled to summary judgment on that basis alone.  As a consequence, none of Carpenter's claims remain, and this suit will be dismissed by separate judgment.

### IV.  CONCLUSION

For the foregoing reasons, the motion for summary judgment (Doc. 28) filed by defendant Wal-Mart Louisiana, L.L.C. (for the erroneously named defendant Wal-Mart Stores, Inc.) is GRANTED.  By separate judgment, plaintiff Virgile O. Carpenter's suit will be DISMISSED WITH PREJUDICE.

SIGNED on this 20th day of May, 2008 at Alexandria, Louisiana.

Dee D. Drell
United States District Judge